Reese, J,
delivered the opinion of the court.
For the plaintiff in error, it is insisted, 1. That the circuit court erred in refusing to set aside the verdict and grant a new trial, because it is alledged, that the facts proved on the trial are not sufficient to sustain the verdict.
On attentively considering the proof set forth in the bill of exceptions, we are unable to come to the conclusion, that the evidence does not warrant the verdict. On the contrary, we are all of opinion, that the verdict of conviction is well sustained by the evidence; and indeed properly, and almost necessarily, resulted from it. It were a task neither neces? sary ,.nor profitable, to refer to the testimony, for the purpose of maintaining, by commentary and argument, the opinion which we have announced.
2. For the plaintiff in error it is insisted, that the circuit c.ourt erred in that part of the charge which relates to murder in the first degree; the part of the charge excepted to was as .-follows — “That to constitute murder in the first degree, it -would not be sufficient that the killing was wilful and malici,ous. It must also have been deliberate, and premeditated; ..that in the. absence of passion, or provocation, the length of time during which ¡he prisoner deliberated and premeditated wa? immaterial; that if there was neither passion nor provocation, and the design to kill was formed, it would make no .difference whether that design had been deliberated on bi;t *277 .¡one moment, oue day, or one week; but if the design J.0 kill was formed under the influence of passion, or upon provocation, and the killing ensued -before the passion had time to subside, it will only be murder in the second degree, or manslaughter, if the provocation was a sufficient and legal one, as explained to the jury.”
We are all of opinion, that in the charge to the jury above quoted, there.is no error. It is maintained by the opinion of this court, in Dale’s case, 10 Yer. 552, that in cases other than those, the circumstances of which are specified in the statute, to constitute murder in the first degree, “the killing must be done wilfully; that is, of purpose, with intent that the act by which the life of a party is taken should have that effect — and deliberately; that is, with cool purpose,— .and maliciously; that is, .with malice aforethought, — and with premeditation; that is, a design must be formed to kill, before the act, by which the death is produced, is performed.” The opinion of the circuit court we regard as in exact con.formity to the above authority.
3. For the plaintiff it is insisted, that the circuit court ..erred in -permitting the declarations of Mary Anthony, the deceased, made in articulo mortis, to go to the jury, as testimony, and this upon two grounds; first, as being contrary to the bill of rights, which secures compulsory process for witnesses in behalf of defendants in criminal cases, and provides, that they shall be confronted with the witnesses against them; and secondly, because it did not sufficietly appear that Mary Anthony was conscious at the time of such declarations of her danger and of impending death.
Upon the first ground of objection, we are all of opinion, thatlthe bill of rights cannot be construed to prevent declarations properly made in articulo mortis, from being given in .evidence against defendants in cases of homicide. The provision in the bill of rights was intended only to ascertain and perpetuate a principle in favor of the liberty and safety of the citizen, which, although fully acknowledged and acted upon before and at the time of our revolution, had been, yielded to the liberal or popular party in Great Britain after a *278 long contest, and after very strenuous opposition from the crown, from crown lawyers, and if I may so speak, crown statesmen. In this case, as in that of libels and some others,, the object of the bill of rights was not to introduce a new principle, but to keep ground already gained, and to preserve and perpetuate the fruits of a political and judicial' victory,, achieved with difficulty, after a violent and protracted contest. That our view of this question is correct, is made manifest by the fact, that after more than forty years from the adoption of our first constitution, this argument against the admissibility of dying declarations, on the ground of the bill of rights, is for the first time made, so far as we are aware in our courts of justice; and if made elsewhere it does not appear to have received judicial sanction in any state.,i
2. As to the other ground of objection, namely, that there is not sufficient evidence to show that the deceased knew or thought herself to be in imminent danger of death, at the time the declaration was made; a majority of the court are of opinion that it also is not tenable. The general principle deduced from all the cases is stated, 1 East. P.C. 854, to be that “it must appear that the deceased, at the time of making, such declarations, was conscious of his danger; such consciousness being equivalent to the sanction of an oath, and that no man could be disposed, under such circumstances, to belie his conscience, none at least, who had any sense of reli-ligion. But such consciousness need not have been expressed by the deceased. It is enough if it might be collected from circumstances; and the court are to judge of this consciousness previous to this sort of testimony.
The declaration in the case before us was made about twelve hours before the death of the deceased; and the physician to whom it was made, states that the wound was a large pistol shot, entering near the navel, and was such a wound as would ninety-nine times in a hundred produce death; that he thought at the time of the declaration that the deceased was fast sinking, but that he had made no communication to her, nor heard any made by any other person, informing her of her approaching dissolution, nor heard her say any thing *279 concerning her consciousness of her approaching dissolution, only, “that she was suffering great pain, burning heat, and great sickness of the stomach.”
If the dangerous nature and character of the wound, the state and illness of the party, her sinking condition, and her statement of extreme suffering, and of those symptoms which usually precede death, are circumstances from which in any case the consciousness of danger can be collected, they exist in the present case, and would justify the inference of such consciousness. In Woodcock’s case, 1 Leach, 503, Old B. 1789, before C. B. Eyre, Ashhurst, J., and Adair, Serg., Recorder, when a woman, who bad been dreadfully wounded, and who afterwards died of the wounds made a declaration, the question was, whether it was made under the impression that she was dying. The surgeon said that she did not appear to be at all sensible of the danger of her situation, dreadful as it seemed to all around her, but lay quietly submitting to her fate, without explaining whether she thought herself likely to live or die. Eyre, C. B. was of opinion, that inasmuch as she was mortally wounded, and in a condition that rendered immediate death almost inevitable; as she was thought by every person about her to be dying, though it was difficult to get from her particular explanations as to what she thought of herself and her situation; her declarations made under these considerations were to be considered by the jury as being made under the impression of her approaching dissolution, for resigned as she appeared to be, she must have felt the hand of death, and must have considered herself as a dying woman. And in Winter’s case, 40 George 3d, McNally, 386, before Lord Kilwarden, C. J., and Kelly, J., the declarations of the deceased were received, although she did not intimate that she considered herself in a dying condition, or that she had any apprehension of immediate death, it appearing that she had been absolved, and received extreme unction from a Catholic Priest. In John’s case, reported in 1 E. P. C. 1790, from the MSS. of Bullet’, Judge, it was ruled in the trial, among other things, “that the evidence of the state of the deceased’s health, at tb'e;..time the declarations were made, was sufficient to show *280 that she was actually dying, and that it' was to be inferred from it, that she was conscious of her situation.” The prisoner having been found guilty, this point, among others, was referred to the judges, who, at a conference in Easter Term, 1790, all agreed that it ought not to be left to the jury to say. whether the deceased thought she was dying or not, for that must' be decided by the judge before he receives the evidence. “And that if a dying person either declare that he knows his danger, or it is reasonably to be inferred from the wound or state of illness, that he was sensible of his" danger, the declarations are good evidence.”
Note. In the 21st vol. of the American Jurist, 468, there is a brief notice of a dissertation by C. I. Mittermaier upon criminal imputability. In this dissertation, the author, to arrive at a solution of the questions — By what signs is it to be known, that the agent has not a knowledge of the morality of his act, and the liberty to abstain from it? What degree of injury of the intellectual faculties is necessary to destroy imputability? — lays dowD the following practical
RULE.
In order to withdraw the agent from the imputability of his act, it is not aul-ficient that his mind should for the moment be blinded by a transient cause— it is necessary, that the feeling which impels him to crime should arise from a disease;
*280 It is obvious that this rule or principle, so distinctly stated, does not mean that the inference may be drawn from the mere fact, that the wound, in the opinion of the man of science, was in point of fact mortal; but that the nature of the wound or the' state of illness should be such as to affect the knowledge, and control the opinion of the dying person himself, as to the danger to which he stands exposed; for in that very case, where the wounds were bruises and contusion from blows or kicks, all the judges but two held that there' was no foundation for supposing that the deceased considered herself in any danger at all. But in the case before us, the dreadful nature of the wound, the state of illness as proved by the physician and declared by the deceased herself, were' such as could not leave her, or any rational being in doubt as to her being in great danger of immediate death.
The evidence in question, in reference to the state of facts’ shown upon the record, was of very slight importance, if of any, on the part of the state; but we lay no stress upon' that consideration.
Let the judgment be affirmed.
That this disease should be its only source;
And that its power á'hoiíld b‘é so irresistable, that the liberty to’ afct ceases completely td exist.
When any form of insanity is relied upon as a defence, the inquiries to be made and prosbcüted by the triers, according' to this rule, would bfe--Was there a disease? If there was, what was the degree of it? And the solution oí these questions, it is manifest, would require a painful collection and investigation of minute and various facts, to be derived, in most instances, from unskilful witnesses, and involving a scrutiny of the prisoner’s past life. Should the disease be established, then the inqniry must be made — was the prisoner impelled to the act by the specific feeling which arose from the disease and that only? For in cases of strict monomania, the party is perfectly sane except upon a single point or subject; and hence monomanics are as capable of crime as others, except in the case only where they act under the influence of the feeling produced by the disease.